## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

EDWIN RODRIGUEZ LOPEZ, NYDIA TORRES PEREZ
and their conjugal Partnership,

        Civ. Num. 14-

Plaintiffs

        Re:   Civil Rights Violations

vs.

                Preliminary Injunction
                Declaratory Judgment

THE PUERTO RICO ELECTRIC POWER AUTHORITY
 JORGE HERNANDEZ PEREZ, ZORAIDA FUENTES
 MOURE and their conjugal partnership, in his personal
And Official capacities, JUAN ALICEA FLORES, JANE
DOE and their conjugal partnership in his personal
And official capacities, VICTOR M. OPPENHEIMER
SOTO, SUSAN ROE, and their conjugal partnership, in his
personal and official capacities, MARIA M. MENDEZ RIVERA,
JOHN ROE, and their conjugal partnership, in her
personal and official capacities, DAVID MELENDEZ, JANE DOE
and their conjugal partnership in his personal and official
capacities, MANUEL PEREZ SOLER,
MARIA TERESA ADAMES AQUINO, and their
conjugal partnership, ANGEL FIGUEROA JARAMILLO,
SUSAN ROE and the conjugal partnership formed by
them, JOHN AND JANE ROE and their conjugal
partnership, INSURANCE COMPANIES A, B, and C

        PLAINTIFFS DEMAND
        TRIAL BY JURY

Defendants

---

## COMPLAINT

### TO THE HONORABLE COURT:

COME NOW plaintiffs Edwin Rodriguez Lopez, Nydia Torres Perez and their conjugal

partnership, through their  undersigned counsel, and respectfully ALLEGE and PRAY as

follows:

1

I.     JURISDICTION

1.   This suit is brought and jurisdiction lies pursuant to 42 U.S.C. §§ 1983, 1988, as
     amended, and the First, Fifth and Fourteenth Amendments of the United States
     Constitution.

2.   This Honorable Court has jurisdiction over plaintiff's federal claims under 28
     U.S.C. 1331 and 1343. Its jurisdiction over state law claims is invoked pursuant
     to the doctrine of pendent or supplemental jurisdiction. 28 U.S.C. 1367. The
     following local laws are invoked: the Due Process Clause of the Puerto Rico
     Constitution, Section 4 of the Puerto Rico Constitution, Articles 1802 and 1803 of
     the Puerto Rico Civil Code, and 32 L.P.R.A. § 3115.

3.   The proper venue for this case lies in this Court, as the defendants all reside in
     Puerto Rico and the causes of action took place here. 28 U.S.C. 1391(b). All of
     the actions of Jorge Hernandez Perez, Juan Alicea Flores, Victor Oppenheimer,
     Maria M. Mendez, and David Melendez were taken under color of law, and the
     remaining defendants conspired with the public officials to deprive plaintiffs of
     their civil rights.

**Right to a Preliminary Injunction**

4.   In order for this Court to grant a preliminary injunction, plaintiffs must show
     irreparable harm, the likelihood of prevailing on the merits, that the balance of the
     equities weighs in their favor, and that the public interest will be served by the
     issuance of the injunction. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20
     (2008).

2

5. The public officials' actions in conspiring with the remaining defendants to initiate and maintain the baseless decisions to suspend and then discipline plaintiff without grounds and in violation of his fundamental constitutional rights have caused and are causing plaintiffs significant and irreparable harm.

6. The harm includes emotional distress, and severe harm to the reputation of Mr. Rodriguez, whose only "sin" was to work at the Isabela office of PREPA, where defendants sought to dismiss the New Progressive Party supervisors so that defendants could replace those supervisors with people from the Popular Democratic Party and the NPP activist Jose Marcelo Rivera, as they did by replacing the supervisor Nydia Soto with the Popular party activist Alfonso Villafañe, and supervisor Jose Feliciano Bolet with the Popular party activist Maritza Santiago Rosa.

7. Plaintiff Edwin Rodriguez Lopez was suspended for forty hours, placed on probation for a year, and required to provide a sworn statement against Jose Feliciano Bolet and required to agree to testify against Mr. Feliciano in administrative and court proceedings, and ordered to pay restitution due to defendants' unconstitutional conditions in violation of his First, Fifth, and Fourteenth Amendment rights and suffered and suffers irreparable harm as a result.

8. The PREPA defendants in conspiracy with the UTIER defendants used Mr. Rodriguez Lopez as a pawn in their scheme to secure the plum jobs of NPP supervisors for members of the Popular Democratic Party. In the process, all

3

defendants violated Mr. Rodriguez Lopez's First, Fifth and Fourteenth Amendment rights. Mr. Rodriguez Lopez has suffered and continues to suffer irreparable harm as a result of defendants' actions.

9. It is well settled that the dismissal of career employees to replace them with political hacks violates the First Amendment. *See eg., Branti v. Finkel,* 445 U.S. 507, 518 (1980); *Martinez Velez v. Rey Hernandez,* 506 F.3d 32, 39 (1st Cir. 2007); *Jimenez Fuentes v. Gatzimbide,* 807 F.2d 236 (1st Cir. 1986). It is also well settled that a person may not be obligated to testify against another as a condition of employment and that a person does not lose her First Amendment rights by virtue of public employment. *Lane v. Franks,* ___ U.S. ___, 134 S.Ct. 2369, 2380 (2014)

10. PREPA, acting through Mr. Alicea Flores, Mr. Oppenheimer Soto, Mr. Hernandez Perez, Ms. Mendez, and Mr. Melendez in conspiracy with UTIER leadership, dismissed plaintiff, even though plaintiff had not violated PREPA's rules, with untimely charges in order to be able to dismiss the NPP supervisors and Mr. Rivera and to pressure plaintiff to provide a sworn statement against Mr. Feliciano to obtain the illegal goal of substituting Mr. Feliciano with a member of the Popular Democratic Party.

11. Plaintiff is likely to prevail in this litigation. *Winter v. Nat. Res. Def. Council,* 555 U.S. at 20. Defendants violated the Fifth Amendment by threatening to suspend plaintiff without pay based on plaintiff's refusal to waive his right not to incriminate himself without offering him immunity.

4

12. Defendants conspired to violate the Collective Bargaining Agreement by filing the charges after the established deadline; they conspired to violate an arbitrator's decision and a determination of PREPA's Legal Division that security guards are not competent to determine attendance, and they required plaintiff to give forced testimony against Mr. Feliciano in exchange for reduced punishment and then had him sign an invalid release agreement. *Gardner v. Broderick,* 392 U.S. 273 (1968)(unconstitutional to condition continued public employment on waiver of Fifth Amendment rights), *see also Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 429 (1998)(Employment discrimination releases must advise the party of right to consult counsel, provide at least 21 days to consider the waiver of claims, and 7 days to reconsider.)

13. In the case of Orlando Olivencia and Jose Marcelo Rivera, various witnesses called by PREPA and the injunction hearing in that case admitted that the security guards' time notations were inaccurate during the relevant period.

14. Although co-defendant Hernandez testified under oath during the injunction hearing that the first notice he had of the incongruencies between the guards' entries and employees' payroll records was on July 11, 2013, he has since testified under oath that on June 25, 2013 Nydia Soto must have known that he was investigating her conduct regarding the UTIER employees' attendance records.

15. The public interest favors this preliminary injunction to provide plaintiff with the remedies requested herein, particularly given the pattern of unconstitutional

5

behavior by PREPA government officials and the UTIER defendants' cooperation with that unconstitutional conduct.

16. This Court has even seen this particular *modus operandi* of requiring PREPA employees to waive their Fifth Amendment rights in order to keep their jobs. Olivencia v .PREPA, 13-1844 (PAD-MEL) and Lugo v. PREPA 14-1618 (PAD).

17. Miguel Cordero, PREPA's former executive director, admitted publicly that PREPA fabricated cases against employees because of their political ideology, and UTIER's president, defendant Figueroa Jaramillo has confirmed that as recently as August 8, 2014.

19. When plaintiffs' fundamental constitution rights are violated, especially impingement of rights to free speech and free association, even the briefest of such deprivations constitutes irreparable harm. *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 484 (1st Cir.2009).

III. PARTIES

20. Plaintiff, Edwin Rodriguez Lopez is of legal age, a United States citizen, married to Nydia Torres Perez, with whom he forms a conjugal partnership, and a resident of Camuy, Puerto Rico. At all times relevant to the instant Complaint, plaintiff was an individual protected by the laws invoked in this Complaint. Mr. Rodriguez Lopez is a member of the New Progressive Party.

21. Defendant, the Puerto Rico Electric Power Authority is sued for injunctive relief only, not money damages.

22. Defendant Juan Alicea Flores is sued in his official and personal capacities for

6

conspiring with the remaining co-defendants to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' Fifth and First Amendments right s not be to coerced into making statements, and Mr. Rodriguez Lopez's First Amendment rights to belong to the political party of his conscience and to refrain from testifying against Jose Feliciano Bolet, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Alicea Flores also violated plaintiff's rights under the Puerto Rico Constitution. Mr. Alicea is a member of the Popular Democratic Party.

23. Defendant Victor Oppenheimer Soto, Esq. is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge Hernandez Perez, David Melendez, Esq., Manuel Perez Soler, Maria Mendez, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into false statements, and Mr. Rodriguez Lopez's First Amendment rights to belong to the political party of his conscience, and to abstain from testifying against Jose Feliciano Bolet, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Oppenheimer Soto is a leader of the PREPA organization Energia Popular, a political partisan group of the PDP.

7

24. Defendant Maria Mendez, Esq. is sued in her official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge Hernandez Perez, Victor Oppenheimer Soto, Esq., David Melendez, Esq., Manuel Perez Soler, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' Fifth Amendment rights not be to coerced into making statements, and Mr. Rodriguez Lopez's First Amendment rights to belong to the political party of his conscience and to refrain from testifying against Jose Feliciano Bolet, all of which resulted in plaintiff being suspended, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Ms. Mendez also violated plaintiffs' rights under the Puerto Rico Constitution and defamed them on the radio program Noti Uno. On information and belief, John Roe is Ms. Mendez's husband, with whom she forms a conjugal partnership. Ms. Mendez is a member of the Popular Democratic Party and had been the Secretary of the PREPA Board of Directors at the same time she is Director of Human Resources of PREPA. According to an October 15, 2013 Vocero newspaper article, in the past Ms. Mendez received a complaint from Government Ethics Office when she was the PREPA Legal Consultant but OCAM office granted a retroactive waiver from 1999 until 2003. Mendez Rivera, however, violated the law in 2005 (case number 06-80) for the same thing. Ms. Mendez did not request a waiver to the State Department even though her husband had contracts with the Government Development Bank (GDB) and the Courts Administration. For this ethical violation Rivera Mendez paid a fine of $ 2,000. The newspaper's source said that Ms. Mendez Rivera is the primary liaison between

Fortaleza and PREPA and exerts an important role in giving the nod to renewable energy projects within the corporation. In this administration no renewable energy projects have been approved.

25. Defendant Jorge Hernandez Perez is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Esq., Victor Oppenheimer Soto, Esq., David Melendez, Esq., Manuel Perez Soler, Maria Mendez, Esq., and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into making statements, and First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Hernandez also violated plaintiffs' rights under the Puerto Rico Constitution. On information and belief, Zoraida Fuentes Moure is Mr. Hernandez Perez's wife, and the two of them form a conjugal partnership. Mr. Hernandez Perez is a member of the Popular Democratic Party and has worked in the Quebradillas office of PREPA, where he knew plaintiff and plaintiff's political affiliation. Mr. Hernandez Perez altered the payroll records of employees of the Popular Democratic Party, so it did not look like they had the discrepancies Mr. Rodriguez Lopez and other NPP employees had. Mr. Hernandez Perez also authorized per diem allowances for these same employees in violation of PREPA's policies.

26. Defendant Manuel Perez Soler is sued for conspiring with co-defendants Alicea, Oppenheimer, Mendez, Hernandez Perez, Melendez, and Figueroa Jaramillo to

9

violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not to be coerced into making statements, and Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiff being suspended without pay, threatened with dismissal, and then disciplined. On information and belief, Jane Doe is Mr. Perez's wife, and the two of them form a conjugal partnership. Mr. Perez Soler also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Perez was a Popular Democratic Party city council member in the prior administration of Mayor Carlos Delgado in violation of the Collective Bargaining Agreement between PREPA and UTIER.

27. Defendant Angel Figueroa Jaramillo is sued for conspiring with co-defendants Alicea, Mendez, Oppenheimer Soto, Hernandez Perez, Melendez, and Perez Soler to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not to be coerced into making statements, and his First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. On information and belief, Susan Roe is Mr. Figueroa Jaramillo's wife, and the two of them form a conjugal partnership. Mr. Figueroa Jaramillo also violated plaintiffs' rights under the Puerto Rico Constitution.

28. Defendant Insurance Companies A, B, and C are one or more insurance companies that may have issued and have in effect policies of insurance for the

10

risks that result from the acts stated in this Complaint, the identity of which are unknown at present.

29. Defendants John Doe, Jane Doe, John Roe and Jane Roe, and their respective conjugal partnerships, are persons responsible for the acts and damages alleged in the instant case whose identities are unknown at this moment.

III.    FACTS

**Who Plaintiff Is**

30. Mr. Rodriguez Lopez began to work for the Puerto Rico Electric Power Authority on December 4, 2000.          .

29. Mr. Rodriguez Lopez is identified publicly at PREPA with the New Progressive Party and supports NPP candidates with campaign contributions.

30. The vast majority of PREPA's employees belong either to the Energeticos del NPP or to Energia Popular, the Popular Democratic Party organization of PREPA employees.

31. Who belonged to each political partisan group was common knowledge at PREPA. Jorge Hernandez Perez, David Melendez, and --- knew that Mr. Rodriguez is a member of the New Progressive Party.

32. PREPA employees' time records are recorded by their sign in/sign out sheets at the job. The procedure for accrediting payroll records does not mention the controlled access system because the controlled access system is not used to verify attendance.

33. In an arbitration decision there is a ruling on the access control system where

11

PREPA stipulated with UTIER not use the access control system to discipline employees or dock them for time allegedly not worked

34. The Director of PREPA's Legal Division has determined that controlled access records are not to be used to determine the arrival or departure times of PREPA employee.

35. The records of security guards are unreliable.  because employees do not always arrive to work in their cars; they may be dropped off by a family member, etc. and they may leave the Isabela premises in their personal vehicles, but still be involved in work activities.

36. Furthermore, PREPA witnesses have admitted in sworn testimony before this Honorable Court  that the security guards at the Isabela guardhouse lack an accurate chronometer prior to July 2013. All of Mr. Rodriguez Lopez's alleged tardy arrivals occurred prior to July 2013.

37. PREPA supervisors met with the private security company on July 11, 2013 to discuss the discrepancies between the information reported by the guards and the facts. As a result of that meeting, the security guard's supervisor acknowledged their errors and agreed to improve their recordkeeping in the future, and PREPA provided the guards with a time clock.

38. The collective bargaining agreement between the Union de Trabajadores de la Industria Electrica y Riego (UTIER) and PREPA provides that any disciplinary action for misconduct must be brought within 30 working days of the employee's supervisor learning of the alleged misconduct.

12

**The Illegal Summary Suspensions**

39. On August 19, 2013, when Mr. Rodriguez Lopez arrived at work,  Mr. Rodriguez went to greet Nydia Soto, the manager of the Isabela office, who was reviewing the guards' registries.

41. Ms. Soto asked Mr. Rodriguez why he wrote down that he had left at 4:00 pm on August 18, 2013, when the guards' registries showed him leaving earlier.

42. When Ms. Soto and Mr. Rodriguez reviewed the guards' registry, they realized that the guard had put Mr. Rodriguez's arrival time in a PREPA vehicle from the field as the time Mr. Rodriguez left PREPA for the day, when Mr. Rodriguez had in fact been working after he returned from the field.

43. Mr. Rodriguez Lopez observed other significant errors in the guards' registries, since the guards did not know which employee had what vehicle.

44. Mr. Rodriguez Lopez has a Toyota Tacoma pick up, which is similar to the vehicles driven by two co-workers who have different schedules than Mr. Rodriguez.

45. After his meeting with Ms. Soto, Mr. Rodriguez left the office to begin his work route, but he received a communication that he should not leave because personnel from Arecibo were coming to the office. Laurentino Nieves Esteves, a supervisor of client service in the Isabela commercial office, and Luis Velazquez, from security, escorted about a dozen other PREPA employees to an empty office on the second floor.

46. As Mr. Rodriguez waited, his supervisor, Mayra Grajales, arrived and told him

13

that she had not been able to sleep because she had heard that 18 suspension letters were being issued from Arecibo. Since Mr. Rodriguez knew that he had not violated any PREPA rule, he was not concerned for himself, but he did worry about his colleagues.

47. The supervisors Jose Torres Perez, Nydia Soto Quiñones, and Jose Feliciano Bolet, all members of the New Progressive Party, were eventually fired. Defendants eventually replaced Ms. Soto with Alfonso Villafañe, a member of the Popular Democratic Party until she was restored to her position based on PREPA's violations of its procedures and of Ms. Soto's constitutional rights.

48. The vast majority of the PREPA employees on the list to be fired were known members of the New Progressive Party.

49. Plaintiff's co-worker, Orlando Olivencia, called Manuel Perez Soler, the UTIER representative to be present during these disciplinary proceedings, but Mr. Perez Soler refused to come.

50. On information and belief, Mr. Perez Soler already knew the scheme that Mr. Hernandez Perez had concocted with the other defendants to dismiss plaintiffs' NPP supervisors based on fabricated charges from subordinates fearful of losing their own jobs and threatened with criminal prosecution.

51. Mr. Luis Velazquez began calling the employees on the list one by one.

52. Mr. Velazquez called Mr. Rodriguez Lopez to a room from the hallway where he had been waiting. Mr. Hernandez handed him a letter and told him to read the letter outside.

14

53. Mr. Rodriguez Lopez collected his personal belongings and left the PREPA offices.

54. The letter stated that plaintiff had been repeatedly late, had misused PREPA property, had falsified documents, had limited PREPA's production, had committed theft and embezzlement, and had abandoned their employment. The letters did not accuse either plaintiff of leaving work early

55. After receiving the letter, Mr. Rodriguez talked to his colleagues, who were very upset, some of them crying.

56. Mr. Rodriguez saw Mr. Colon, who is in a wheelchair, heartbroken. Mr. Rodriguez and other colleagues approached Mr. Colon to console him and Mr. Colon, who's going to give me work, I'm in a wheelchair?

**Instead of Defending Their Members, the UTIER Defendants Add to the Pressure**

57. The UTIER leaders called plaintiff and the other dismissed union members to attend a meeting at the UTIER facilities in Camuy.

58. Shortly after 1:00 p.m., plaintiffs' co-worker Olivencia texted Angel Figueroa Jaramillo and asked him to call him before a meeting set for 5:00 pm. because Ms. Nydia Soto told him that she had documents that could get the charges dismissed against everyone who was suspended that very day.

59. Ms. Soto had a copy of an e mail from July 2013 that demonstrated that management had been dissatisfied with the recordkeeping of the security guards because they noted times incorrectly and failed to note the entry and exit of

15

certain cars. PREPA's witnesses have subsequently admitted that this is true.

60. In the e mail, Maritza Santiago confirmed the meeting that Alfonso Villafañe had with the management of the security company, admitting that the security guards were to rectify the recordkeeping errors they had been committing going forward.

61. Ms. Santiago has also admitted under oath that prior to July 11, 2013 the security guards had no accurate means to determine the time when the PREPA employees arrived or left the Isabela facilities.

62. All of the allegations against the PREPA workers who were suspended from duty on August 19, 2013 involved recordkeeping from before July 2013, those most recent being the end of May 2013.

63. In the days before August 19, 2013 PREPA supervisors from the Popular party altered records regarding union workers from the Popular party so that it would appear that they had arrived on time, when they had been late according to the guards' logbook.

64. At the meeting at the UTIER in Camuy, Mr. Figueroa Jaramillo said that he had known that the dismissals were going to occur for the last two or three weeks, and that in all the time he had been in the union, he had never seen so many employees dismissed from one regional office at a time.

65. Mr. Figueroa Jaramillo also told the suspended workers that the union would not be getting them lawyers for their informal hearings and that they should not hire their own attorneys because in his experience private lawyers only ruined cases; that no one should speak at the informal hearings; and that they should wait for

16

the formal hearings to present exculpatory evidence, but that the formal hearings could take years to be scheduled.

66. In the cases of the only two union workers to request formal hearings, defendants [the PREPA defendants had to reach an agreement with the UTIER defendants for a hearing officer to be chosen], delayed the beginning of the formal hearing for a year to begin and only began as a result of this Court setting a hearing on the injunctive relief sought in that Complaint. The undersigned file a Motion to Dismiss the charges against Orlando Olivencia and Jose Marcelo Rivera on August 28, 2014. David Melendez first asked for an additional week to respond to the charges and then asserted that he was ill and not working, even though he appeared as sole counsel for PREPA in the administrative proceedings against the supervisors this very week. Counsel for the UTIER also asked for an additional week – without providing any reason – continuing the UTIER's practice of collaborating with PREPA to deprive members of the PNP of their constitutional rights. Although more than a month has passed since the Motion to Dismiss was filed, neither Melendez nor the UTIER has responded to it. Meanwhile, two UTIER members remain jobless as Figueroa Jaramillo had threatened.

69. Fausto Ramos Quiros, Esq., the hearing officer upon whom defendants agreed, stated at the beginning of the formal hearing of Orlando Olivencia and Jose M. Rivera Ramirez that he had been notified that he had to set the formal hearing with a sudden urgency just before the injunction hearing in 13-1844 (PAD-MEL).

17

70. At the Camuy meeting on August 19, 2013, Mr. Olivencia said that he imagined that the UTIER would be holding a general strike the next day to protest this mass dismissal without cause.

71. Mr. Figueroa Jaramillo responded that the whole matter had to be settled quickly, before the press learned of it because PREPA's image had suffered a great deal recently; he told them that they could be facing criminal charges because they had been accused of stealing time from PREPA, and he instructed all of those present at the meeting not to talk about what had happened with anybody, particularly the media.

72. Mr. Figueroa Jaramillo's conduct in this instance contrasted sharply with his conduct in other labor disputes with PREPA, during which he was always ready to call for a general strike and delighted in making PREPA look bad in the press. Since the August 2013 summary dismissals, the UTIER has called general strikes repeatedly in response to PREPA actions.

73. In addition to trying to silence the union members, Mr. Figueroa Jaramillo further warned them that if criminal charges were filed, UTIER could not defend them.

74. Mr. Figueroa Jaramillo said that he was going to meet with Victor Oppenheimer, Esq., the director of PREPA's legal division, and that he would have to accept whatever Mr. Oppenheimer was willing to offer. Again, Mr. Figueroa's stance in this instance varied sharply from his usual call for strong stands in favor of workers' rights and it was designed to intimidate the suspended workers, most of whom were members of the NPP.

18

75. Mr. Figueroa Jaramillo also told all the union members at the meeting that for less serious accusations than the charges against them, "El Buho" Marrero had gone to prison. [Senator Marrero was convicted of misappropriating $600.00).

76. Someone at the meeting asked Mr. Figueroa Jaramillo what would happen with their medical insurance, and he said he did not know, that he would try to keep their insurance in place until their formal hearings, but that he could not guarantee that, even though the practice was for union members to keep their PREPA medical plan which a hearing was pending.

77. Mr. Figueroa Jaramillo also told all the union members that if they had any money in their pension plans, that they should take it out quickly because if they left it in, it would be more difficult to withdraw later.

78. Mr. Rivera, the PREPA employee who had tried to stay with Mr. Colon, told Mr. Figueroa Jaramillo that the suspension was obviously political because Mr. Hernandez had not suspended Popular employees who had also left the parking area before the end of the workday according to the guard's logbook since they performed the same jobs at the same time as employees who had been dismissed.

79. When Mr. Rivera said this, Mr. Figueroa Jaramillo got angry and said that everyone knew that he [Mr. Figueroa] was a member of the pro Independence party, and that he was not going to talk about politics.

80. Even though Mr. Figueroa Jaramillo knew or should have known that the suspensions were invalid because they were untimely and violated the Collective

19

Bargain Agreement and the existing arbitrator's decision and that of PREPA's Legal Division, he mocked Mr. Rivera for saying the suspensions were politically motivated. He said angrily to Mr. Rivera that he could not add more people to the bucket because it was too heavy already and if he kept adding weight he was not going to be able to lift it. [Meaning that the union should not be concerned about the dismissals without just cause of plaintiffs' NPP supervisors.]

81. Puerto Rico's appellate jurisprudence is replete with cases of the UTIER defending its members for far more serious charges than the tardiness alleged here. The UTIER has defended union members who have failed drug tests time after time after time, and who have even served prison terms for controlled substances.

82. The UTIER's efforts to coerce union members who were confronted with criminal charges for untimely charges of tardiness is evidence of their conspiring with PREPA to harm NPP members to benefit PDP members.

83. Mr. Figueroa Jaramillo repeated that he had a meeting scheduled with Mr. Oppenheimer the next day at 7:30 am, and that he was going to accept whatever offer Mr. Oppenheimer made.

84. On August 20, 2013 at around 2:30 p.m., plaintiff learned that PREPA had reinstated their co-worker Mairis Gomez because they said payroll had overlooked certain things, so they closed her case. Ms. Gomez was suspended with the other NPP workers on August 19, but PREPA has never revoked her suspension in writing.

20

85. On August 21, 2013, Mr. Perez Soler met with the UTIER members to inform them of the settlements Mr. Oppenheimer was offering.

86. In the particular case of Mr. Rodriguez Lopez, the discrepancies for late arrivals, the only thing for which he was suspended, amounted to 426 minutes.

87. Subtracting for the ten minutes of grace period that Mr. Hernandez testified he granted, the number of minutes was 394.

88. In their Opposition to Motion for Preliminary Injunction in 13-1844, Docket 44, PREPA asserted that it only suspended employees with more than 500 "stolen" minutes, but the PREPA defendants suspended Mr. Rodriguez, an NPP member, for arriving at PREPA for a total of 394 minutes.

89. Mr. Perez Soler told each of the suspended workers what each had to say in a sworn statement to procure the dismissals of their NPP supervisors, saying that this is what he had negotiated with Mr. Oppenheimer as a condition of their returning to work.

90. When Mr. Perez Soler called Mr. Rodriguez Lopez in by himself, he told him that Mr. Rodriguez's case was the worst one, and that he would have to take his punishment. Mr. Rodriguez asked why, and Mr. Perez said because of the number of minutes.

91. When Mr. Perez Soler him that he would have to accept 40 hours of suspension, a year of probation, repay the time "stolen" and give a sworn statement. Mr. Rodriguez was desperate. He felt emotionally sick. He did not even know what he was accepting. He just wanted to get home and tell his wife and daughter that

the case was over.

92. Mr. Perez Soler discussed the conditions to be placed on all the employees in order for them to return to work, as Mr. Perez Soler consulted on the phone with Mr. Oppenheimer.

93. The meeting ended at around 8:15 p.m.

94. Mr. Rodriguez went home after the meeting, where his wife was studying, since she is completing her master's degree. Mr. Rodriguez's daughter was with his wife.

95. Ms. Torres told Mr. Rodriguez that someone had called her to tell her that several people had been suspended from PREPA in Isabela. Mr. Rodriguez answered that it was true, that he was one of them, but that he had not told her because he had not wanted to worry her.

96. His co-workers told Mr. Rodriguez that Mr. Figueroa Jaramillo said the formal hearing would take five to six years. Since Mr. Rodriguez is the primary breadwinner in his family, and his work has been limited to PREPA for the last 14 years. Given Puerto Rico's contracting economy, the prospect of several years without work for a middle aged man was terrifying, as Mr. Figueroa Jaramillo intended it to be.

97. Mr. Rodriguez's daughter ran to her room and began to cry. Ms. Torres did the same.

98. That night Mr. Rodriguez could not sleep thinking of how unjust the procedure had been. The next day all Mr. Rodriguez could think of that his daughter suffers

from anorexia and how without a medical plan, she would suffer enormously.

99. Mr. Rodriguez also worried about the mortgage on his house that he had built, of his three children's university studies, all of his economic commitments, and how difficult it is to find work in Puerto Rico.

## Dismissals with the Due Process of an Informal Hearing and in Violation of the Fifth Amendment.

100. On August 22, 2014, the suspended employees were called to individual meetings about the charges against them, and Mr. Perez Soler came up to the each of the union members and told them that no one was going to testify at the meetings because it went badly for union members who testified.

101. When it came time for Mr. Rodriguez Lopez's interview a few days later, since the interviews did not finish on August 22, he answered the basic questions as to his name and address, but when the questions about his alleged misconduct came, Mr. Perez Soler wrote on his notebook that Mr. Rodriguez Lopez should state that he invoked his right not to testify.

102. PREPA tape recorded the meetings, but now denies that the recordings exist.

103. PREPA warned Mr. Rodriguez Lopez that if he testified, his answers could be used against him in a Court of law. In the summary suspension letters, the PREPA defendants had accused Mr. Rodriguez Lopez of committing felonies.

104. The PREPA Defendants did not offer Mr. Rodriguez Lopez immunity from criminal prosecution. The UTIER defendants did not request immunity for Mr. Rodriguez Lopez.

23

105. Based on Mr. Rodriguez Lopez's failure to put on evidence in his defense, and the security guards' invalid and untimely statements as to his attendance, PREPA suspended him without pay in violation of the First, Fifth, and Fourteenth Amendments and took away the cards of his family medical insurance

**UTIER's Insistence at PREPA's Behest on the Sworn Statements as a Quid Pro Quo for Reinstatement**

106. After the investigative meetings ended, Mr. Perez Soler told all the suspended employees to go directly to the UTIER headquarters in Camuy.

107. The employees had been waiting without eating, and Mr. Perez Soler said he would order pizzas.

108. While they waited for the pizza, Mr. Perez Soler told them that the terms of the agreement with PREPA had changed. The suspended union members would have to testify against three NPP management employees, accept the misconduct alleged, some had to return the money "stolen" [by having been tardy], and some had to accept probation for a year.

109. Mr. Olivencia asked why the day before he had been offered by Mr. Oppenheimer the chance to return to work in exchange for a 40 hour suspension, and Mr. Perez Soler answered that Maria Mendez, Esq. had changed all the agreements because PREPA Executive Director Juan Alicea Flores had not yet approved the agreements when Mr. Perez Soler told them of the original proposals.

110. Mr. Perez Soler told them that Attorney Mendez required all the suspended

employees to testify against the three NPP supervisors and if they wanted to go back to work, they had to accept what she says. Defendant Mendez is a member of the Popular Democratic Party

111. Mr. Perez then told Mr. Lasalle that he would not be suspended, but that he would have to testify against Nydia Soto. Mr. Lasalle answered that he preferred a suspension of 500 hours and not to testify against Ms. Soto. Mr. Perez replied that if Mr. Lasalle wanted to return to work, he had to testify against Ms. Soto.

112. Mr. Lasalle began saying that his dignity was all that mattered, and that he did not agree with the proposal. Mr. Olivencia said that he had evidence that would exonerate everyone, that no one should sign, and left the room. Mr. Perez Soler then told everyone else not to pay any attention to Mr. Olivencia because Mr. Olivencia was crazy, that he thought that he could save the workers with one piece of paper, that he could rebut one or two of the dates, but not all of them. Of course, Mr. Olivencia had Ms. Soto's e mail which would have exonerated everyone because it had the guard company's admission in July 2013, after all the alleged offenses had occurred, demonstrating that the guards' entries as to arrival and departure time were untrustworthy.

113. Mr. Perez took Mr. Lasalle and then Mr. Morales and Mr. Carlos Lugo to the room, and then they came out, the last two saying that each person had to save himself. [La salvacion es individual.] , and Mr. Lasalle as calm as a lamb after he had been so angry about his dignity just minutes before.

114. Another of the suspended workers, William Quiñones, said that Jorge

25

Hernandez Perez himself had authorized him to work Sunday with a side agreement, and now Mr. Hernandez Perez wanted to fire the NPP supervisors for having side agreements. Defendant Hernandez Perez is a member of the Popular Democratic Party.

115. The suspended worker Angel Alicea mentioned that he worked Saturdays in Quebradillas, and Regional Administrator's assistant authorized them to work through lunch to leave early. The Regional Administrator is Alfonso Villafañe, who is also a member of the Popular Democratic Party. The PREPA defendants never asked for testimony against Mr. Villafañe.

116. The testimony that defendants sought to implicate supervisors only involved NPP supervisors.

117. Meanwhile, Mr. Perez was talking with some of the suspended workers one by one in another office. As each worker left the office, he had stopped complaining and agreed to testify against management.

118. The suspended workers were anxious, hungry, suffering, fatigued mentally, with their spouses calling, unduly pressured by Mr. Perez's tactics, which were particularly ironic for a union official to tout each man for himself.

119. Mr. Perez Soler told Mr. Rodriguez Lopez that he had to sign a statement implicating Jose Feliciano Bolet in order to return to work because the charges against Mr. Rodriguez Lopez were so serious.

120. Mr. Perez said that they were waiting for call from Mr. Oppenheimer, who called at about 8:00 pm.

121. Mr. Perez wrote on a yellow pad as Mr. Oppenheimer dictated, "They can be referred to the government ethics office; to Justice, to the Comptroller." The suspended workers all looked scared at what they were hearing.

122. Even though Mr. Perez knew that the workers should have been allowed to keep their medical insurance, he told them they would lose it in order to pressure them to agree.

123. Mr. Perez told Mr. Oppenheimer that he was going to discuss the agreement with everyone and that he would call back briefly.

124. Mr. Perez then said to the group, "Boys, that's all there is. Do you agree? Will you testify?" Some of the group said yes, but there was no vote.

125. Mr. Perez called Mr. Oppenheimer and told him that everyone was going to plead guilty and testify.

126. Defendants offered no deal to Mr. Rivera. Mr. Rivera stood up and congratulated his colleagues on returning to work, saying that the process was corrupt and had been selective, completely discriminatory against him for ideological reasons, and that even if he had to eat dirt for the next few years, the truth would prevail.

127. Mr. Perez then told the other suspended workers that they should go to the Arecibo regional office the next day, and as soon as they signed the statements against the NPP supervisors, they would get their medical insurance cards back and return to work.

128. On August 22, 2013, the PREPA defendants had plaintiff sign a settlement

27

agreement, stating that he would not sue PREPA. The settlement agreement

violates federal law in that it does not advise plaintiff that he should consult with

an attorney before signing the agreement, it did not provide plaintiff with at least

21 days to consider the agreements, it did not provide plaintiff with at least 7

days to rescind the agreements, and it was not approved by anyone from the

office of the Puerto Rico Department of Labor.

129. The Collective Bargaining Agreement between UTIER and PREPA provides

that the first time a PREPA employee is accused of repeated tardiness she may

receive a formal warning. The sanction for the second and third time an

employee is found to have been tardy repeatedly is also a formal warning. [The

suspension notice Mr. Rodriguez received referred to his entry times not

matching the guards' records, not his exit times.]

130. Being absent from work without prior permission also warrants a formal warning

for a first offense; a second offense warrants a 40 hour suspension.

131. On September 10, 2013, Mr. Oppenheimer visited the PREPA office in Isabela

and told the union workers who had signed the sworn statements and settlement

agreements that they had to repeat the testimony in the injunction hearing due to

be held two days later.

132. Mr. Oppenheimer told Mr. Lugo that he, Oppenheimer, knew that the workers at

the Isabela office had not stolen time from PREPA. Defendant Oppenheimer also

told Mr. Lugo not to worry, that he would not have to testify because the

injunction hearing would be cancelled and the case referred to the administrative

proceedings. Edna Rios, Esq., another PREPA attorney, told Mr. Oppenheimer that he should shut up and not talk too much.

133. Immediately before the injunction hearing scheduled for the supervisors in local Court in September 2013, defendant Oppenheimer pointed to PREPA employee Oscar Colon and said that PREPA was even willing to throw a guy in a wheelchair out of the street, look how bad it's going to be for the rest of you.

134. On September 10, 2013, Mr. Hernandez Perez stated that he did not care if the NPP supervisors, Mr. Olivencia, and Mr. Rivera sued him for political discrimination because he had no money with which to pay a judgment. Mr. Oppenheimer responded that no one was going to be able to sue for political discrimination because he had put some Popular Party members in the group of suspended worker to refute any such allegations.

135. The Superior Court of Arecibo dismissed the request for a preliminary injunction because on September 10, 2013 PREPA designated a hearing officer to hear the supervisors' case. [As noted above, defendants tried to pull the same stunt in 13-1844, when the UTIER and PREPA tried to have the case referred to the administrative hearing officer, but the United States Magistrate Judge denied the motion.]

136. In August 2014, Jose Feliciano Bolet sued Mr. Rodriguez Lopez and a number of other union members for allegedly conspiring with PREPA to violate Mr. Feliciano's rights, even though the PREPA defendant had coerced Mr. Rodriguez Lopez into giving a sworn statement against Mr. Feliciano in exchange for

29

substantially reducing the false charges against Mr. Rodriguez. 14-1631 (GAG).

137. Mr. Feliciano subsequently dismissed his allegations against Mr. Rodriguez, when Mr. Rodriguez confirmed that he had been coerced to provide testimony against Mr. Feliciano.

138. On information and belief, on September 13, 2014, Mr. Perez Soler met with the other union members sued by Mr. Feliciano and told them that the UTIER would be providing them with a defense in that case.

139. On September 19, 2014 in a meeting PREPA called, co-defendant David Melendez, PREPA's in house counsel, told the PREPA employees that Mr. Rodriguez Lopez and the other PREPA workers should testify against the NPP supervisors. Mr. Melendez also told the union members that they had never been threatened with criminal charges, even though both the letters of suspension asserted that Mr. Rodriguez Lopez had committed criminal offenses. Mr. Melendez also warned the UTIER members at the meeting against telling their attorneys that he was telling them that PREPA could not refer them for criminal charges in contradiction of the letters the union members received, and the threats that the UTIER leaders had made.

140. On September – 2014, a secretary from UTIER asked Mr. Rodriguez to bring a copy of the summons and Complaint in the Feliciano-Bolet case to the UTIER headquarters because Harry Anduze, Esq., counsel for the UTIER defendants in 13-1844 would be representing him the Feliciano Bolet case.

30

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## (VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS)

141. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

142. Because Defendants failed to afford Mr. Rodriguez Lopez due process of law by affording him an informal hearing prior his summary suspension, they violated 42 U.S.C. 1983 with knowing and reckless disregard of said Act's proscriptions.

143. Because Mr. Perez Soler and Mr. Figueroa Jaramillo, in conspiracy with the other defendants refused to consider the exculpatory evidence of Mr. Rodriguez Lopez before the illegal suspension, they conspired to and in fact denied Mr. Rodriguez Lopez due process.

144. Defendants summarily suspended Mr. Rodriguez Lopez without due process.

145. Defendants engaged in policies and practices which willfully, or in the alternative unwillfully, discriminated against the plaintiffs by not affording them due process of law.

146. Mr. Rodriguez Lopez has a property interest in his continued employment of which he cannot be deprived without due process.

147. As a result of the before mentioned, Mr. Rodriguez Lopez is entitled to be paid by defendants the following damages: punitive, emotional, and economic damages of not less than the sum of $500,000.00, plus interest and any other benefits allowed by law.

148. All of the previously mentioned acts of the defendants violated 42 U.S.C. 1983, and the other federal laws previously cited.

149.   Mr. Rodriguez Lopez seeks an apology for the false accusations and asks this

31

Court to order PREPA to eliminate his probation, restore his salary for the time he was suspended, and order that PREPA is precluded from charging Mr. Rodriguez for any supposed "stolen" time.

## SECOND CLAIM FOR RELIEF

## PUERTO RICO CONSTITUTIONAL DUE PROCESS PUERTO RICO ARTICLE II, SECTION 7

150. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

151. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico which prohibits the deprivation of property without due process of law. Mr. Rodriguez Lopez seeks an apology, and payment of the 40 hours he was suspended without due process, an elimination of his probation, and an elimination of any pretense by PREPA of charging him for "stolen" time.

152. Defendants' discrimination has harmed plaintiffs emotionally and economically. The amount of damages exceeds $500,000.00 each.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## (VIOLATION OF THE FIRST AMENDMENT)

153. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

154. Defendants by the acts previous described in this Complaint, violated plaintiffs' rights under the First Amendment by forcing him to provide testimony.

32

155. Defendants also violated the rights of Mr. Rodriguez Lopez to associate with whomever he desires based on their political affiliation and to assert his support for statehood without fear of losing his jobs as has happened here.

156. Defendants' discrimination has harmed plaintiffs economically and emotionally, and plaintiffs are entitled to punitive damages for defendants' conspiracy to violate the United States Constitution. The amount of damages exceeds $1,000,000.00.

## FOURTH CLAIM FOR RELIEF
## PUERTO RICO CONSTITUTION ARTICLE II, SECTION 8
## PROTECTION AGAINST ATTACKS TO A PERSON'S HONOR, REPUTATION, AND FAMILY LIFE

157. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

158. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico, Article II, Section 8, which requires that all persons have a right to legal protection against abusive attacks against their honor, reputation and family life.

159. Defendants' aggressive attack on plaintiffs' honor, reputation and family life has harmed each plaintiff economically and emotionally. The amount of damages exceeds $500,000.00.

160. Plaintiffs also seek an apology.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 1983 OF THE U.S. CODE
## THE FIFTH AMENDMENT

161. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force

33

and effect as if herein set forth.

162.   By conditioning their continued employment on a waiver of their Fifth Amendment rights not to incriminate himself, defendants violated plaintiff's Fifth Amendment rights.

163.   The amount of damages exceeds $1,000,000.00.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF ARTICLE II, SECTION II OF THE PUERTO RICO CONSTITUTION

164. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

165.   By conditioning his continued employment on a waiver of the right not to incriminate himself, defendants violated plaintiff's rights under the Puerto Rico Constitution not to incriminate himself.

166.   The amount of damages exceeds $1,000,000.00.

### SEVENTH CLAIM
### ARTICLES 1802, 1803 PUERTO RICO CIVIL CODE
### (Mental and Moral Damages)

167. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

168. As a result of the before mentioned acts and omissions, the defendants have directly and intentionally inflicted emotional distress, humiliation, harassment, and mental anguish on the plaintiffs, in an amount in excess of $500,000.00. Ms. Mendez intentionally defamed plaintiffs by saying they had stolen time from PREPA, with the knowledge that her statements were false and with the intention of harming plaintiffs.

34

The plaintiffs haves suffered immensely because of the illegal activities of defendants and are desperate, depressed, and anxious. They have spent endless nights and days of worry, uncertainty and despair. Their severe mental depression and emotional distress has caused severe problems in their lives.

## EIGHTH CLAIM FOR RELIEF
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

169. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

170. Plaintiffs are suffering irreparable harm each day the false accusations remain in Mr. Rodriguez Lopez's records and the possibility of criminal accusations. Mr. Rodriguez Lopez is still on probation and faces the illegal confiscation of funds to repay time PREPA claims he stole due to defendants' unconstitutional actions. Moreover, as recently as September, co-defendant Melendez was trying to coerce Mr. Rodriguez into testifying against Mr. Feliciano Bolet

171. The likelihood of success on the merits in this case is high because defendants lack any evidence that plaintiffs violated any of PREPA's rules, much less a rule which would cause harm to the Treasury of Puerto Rico or imminent harm to any person.

172. The balance of the equities favors plaintiffs because defendants have no evidence that they violated any rule because they did not do so and instead worked efficiently and effectively for PREPA

173. The public interest would be served by granting a preliminary injunction expunging the illegal accusations from the files of plaintiff, ending the threat of crimination

35

accusations, and ending Mr. Rodriguez Lopez's probation.

174. This Court should also order all defendants to issue a public apology for the unconstitutional disciplinary actions, the coercion in violation of the First Amendment, and Ms. Mendez's defamation.

**TRIAL BY JURY**

175. Plaintiffs demand trial by jury.

WHEREFORE, in view of the foregoing, plaintiff respectfully requests that judgment be entered against the defendants jointly and severally, as follows:

a) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and all defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the First Claim for Relief (Section 1983, deprivation of property without due process of law);

b) Ordering PREPA to expunge plaintiff's records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and all defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the Second Claim for Relief (Due Process Pursuant to the Puerto Rico Constitution);

c) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation

36

and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and pay plaintiffs a sum in excess of $1,000,000.00 as per the Third Claim for Relief (Violation of the First Amendment);

d) Ordering PREPA to expunge plaintiff's records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and all  defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the as per the Fourth Claim for Relief (Attacks on honor, family, and reputation)

e) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and all defendants to pay plaintiffs a sum in excess of $1,000,000.00 plus interest as per the as per the Fifth Claim for Relief (Violation of the Fifth Amendment)

e) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Rodriguez Lopez's probation and the threat of restitution, and the PREPA defendants to repay Mr. Rodriguez Lopez for the 40 hours he was suspended and all defendants to pay plaintiffs a sum in excess of $1,000,000.00 plus interest as per the as per the Sixth Claim for Relief (Violation of Article II, Section II of the Puerto Rico Constitution)

f) Ordering defendants to pay plaintiffs the sum of $500,000 as per the Fifth Claim for

37

Relief (Articles 1802, 1803 of the Puerto Rico Civil Code)

g) Ordering defendants to expunge each plaintiff's record of the false accusations, end

Mr. Rodriguez Lopez's probation, the threat of criminal prosecution of both plaintiffs,

and the threat of restitution to Mr. Rodriguez Lopez as per the Eighth Cause of Action.

h) Ordering defendants to cease and desist from any further discriminatory conduct;

i) Ordering the defendants in the respective causes of action to pay interest,

costs, and attorney's fees, pursuant to 42 USCA §2002-5(k); and,

j)      Granting such other and further relief as may be just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico this  9th day of October 2014.

LAW OFFICES OF
JANE BECKER WHITAKER
/s/Jane Becker Whitaker
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 754-9191
Fax (787) 764-3101
JANE BECKER WHITAKER
USDCPR Bar Number 205110

38

## UNSWORN STATEMENT UNDER PENALTY OF PERJURY

I, Edwin Rodriguez Lopez have reviewed the Complaint in this case and the information contained in it is true and correct to the best of my belief at this time.

Edwin Rodriguez Lopez

This 9th day of October 2014.

39